**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-01049 MMM (Ex) | Date | July 16, 2014 |
|---|---|---|---|

| Title | *Auntie Anne's, Inc. v. Wang* |
|---|---|

Present: The Honorable   MARGARET M. MORROW

| ANEL HUERTA | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**   **Order Granting in Part and Denying in Part *Ex Parte* Application for Temporary Restraining Order**

On May 23, 2014, Auntie Anne's, Inc. ("plaintiff") filed this action against Steve C. and Dinah H. Wang (collectively "defendants").[1]  On June 13, 2014, defendants filed an *ex parte* application for temporary restraining order.[2]  The court denied the application on June 18, 2014 (the "June 18 Order"), concluding that defendants could not demonstrate a likelihood of success on the merits because they had alleged no affirmative claims, and because they had failed to adduce evidence that they faced imminent irreparable harm.[3]

---

[1]Complaint, Docket No. 1 (May 23, 2014).

[2]*Ex Parte* Application, Docket No. 10 (June 13, 2014).

[3]Order Denying *Ex Parte* Application ("Order"), Docket No. 18 (June 18, 2014).

On July 10, 2014, defendants answered the complaint and alleged three counterclaims.[4]  That same day, they filed a second *ex parte* application for temporary restraining order.[5]  Plaintiffs oppose the application.[6]

# I.  BACKGROUND

Plaintiff/counter-defendant operates and grants franchises to operate "Auntie Anne's" stores, which sell pretzels in addition to other food and beverage items.[7]  It owns numerous registered trademarks used in connection with operation of Auntie Anne's stores.[8]  The complaint alleges that franchise agreements for stores in Ontario, California were terminated on March 4, 2014 due to defendants' repeated and deliberate underreporting of gross revenue and resulting failure to make required royalty and advertising fund payments to plaintiff.[9]  Plaintiff asserts that following the termination of the franchise agreements, defendants refused to surrender possession and control of the Ontario stores as required by the parties' collateral assignment of lease agreements.  It alleges that defendants continue to operate the stores and use plaintiff's federally registered trademarks.[10]  Plaintiff pleads claims for ejectment/unlawful detainer and breach of contract.  It also pleads claims for trademark infringement, unfair competition, and trademark dilution under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c).

Defendants/counterclaimants are franchisees of plaintiff; they own eight Auntie Anne's franchised stores in Southern California.  These include two stores at the Ontario Mills Mall in Ontario, California, the East store and the West store (collectively the "Ontario stores"), which they have owned for nearly ten years.[11]  Defendants allege counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of California's Unfair Competition Law, California Business and Professions Code § 17200.  Specifically, they contend plaintiff breached the

---

[4]Answer and Counterclaim ("Answer"), Docket No. 25 (July 10, 2014), ¶¶ 36-48.

[5]*Ex Parte* Application ("Application"), Docket No. 26 (July 10, 2014).

[6]Memorandum in Opposition to Ex Parte Application for Temporary Restraining Order ("Opp."), Docket No. 29 (July 12, 2014).

[7]Complaint, ¶ 3.

[8]*Id.*, ¶ 10.

[9]*Id.*, ¶¶ 1, 25-26.

[10]*Id.*, ¶¶ 1, 10, 18.

[11]Declaration of Steven C. Wang, Docket No. 10-3 (June 13, 2014), Exh. D ("Wang Decl.") ¶¶ 2, 5.

franchise agreements by (1) terminating the agreements for the Ontario stores without cause; (2) terminating the agreements for the Ontario stores without providing notice and an opportunity to cure as required by Section XVII of the agreements; (3) terminating the agreements for the Ontario stores while still taking royalty payments from the Wangs' bank accounts for sales at the Ontario stores; (4) initiating this action without first complying with Section XXIX.B. of the agreements, captioned "Dispute Resolution By Mediation"; and (5) instructing suppliers to cease delivery of necessary inventory and supplies to the Ontario stores.

### A.   Key Provisions of the Franchise Agreements

The franchise agreements require the franchisee to pay a weekly royalty fee equal to 6 percent of gross revenues, which the franchisor may increase to 7 percent in its sole discretion.  Franchisees must also make a weekly advertising fund contribution equal to 1 percent of gross revenues.[12]

Section XVII governs a franchisee's default.  It provides that events constituting an Event of Default without opportunity to cure include

> "b. Franchisee's failure, refusal or neglect to pay, when due, any monies owed to Franchisor";
>
> . . .
>
> e. Franchisee submits to Franchisor on two (2) or more separate occasions at any time during the term of the Agreement any reports or other data, information or supporting records which understate by more than two percent (2%) the Gross Sales for any period of, or periods aggregating, three (3) or more weeks, and Franchisee i[s] unable to demonstrate that such understatements resulted from inadvertent error";
>
> . . .
>
> s. "Franchisee knowingly maintains false books or records or submits any false statements, applications or reports to Franchisor or any assignee of Franchisor."[13]

Upon the occurrence of an Event of Default, the franchisor may "authorize its distributors to withhold shipment to the Franchise of the Franchisor's proprietary products until such time as Franchisee has cured the Event of Default," and/or "immediately terminate this Agreement by giving written notice of termination to Franchisee.  Upon termination, Franchisor may exercise any and all of its rights and remedies afforded by federal, state and local law."[14]

---

[12] Complaint, Exh. A §§ IX.B, X.A.

[13] *Id.* §§ XVII.B.1(b), (e), (s).

[14] *Id.* § XVII.C.1(a), (b).

Section XVIII.C of the franchise agreement provides that "[i]f [the] Franchisee fails to comply with any of the provisions of this Section, Franchisor shall have the right to obtain an injunction from a court of competent jurisdiction restraining Franchisee from violating such provisions, including, without limitation, the continued use of the Marks, and to obtain an order enforcing the other provisions of this Section."[15]   Section XVIII.D gives the franchisor a right to possession of the stores upon an Event of Default.[16]

Section XXIX.B provides for dispute resolution by mediation.  It states, in pertinent part:

"Except as otherwise provided herein in Sections V, VI, VII, XVI, or Paragraph XXIX.G [sic][17] with respect to injunctive or equitable relief, the parties agree that if any dispute between them, or any claim by one or more of them, concerning this Agreement, any related agreement, the Franchise or the Franchised Business, cannot be settled through negotiation, after diligent effort, they will first attempt in good faith to settle the dispute or claim by non-binding mediation conducted under the then prevailing commercial mediation rules of the American Arbitration Association ("AAA").  The request for mediation must be in writing and set forth the reasons why the party believes mediation is necessary. . . .  The parties['] obligation to mediate will be deemed to be satisfied (whether or not the parties have resolved their differences) . . . sixty (60) days after a mediation demand has been made.  If the dispute is resolved by mediation, Franchisee and Franchisor shall sign a binding agreement setting forth the result of the mediation, and any pending arbitration or other legal proceeding shall be dismissed."[18]

Section XXIX.C provides for arbitration in the event mediation is unsuccessful.  It states, in pertinent part:

"Except as otherwise provided herein in Sections V, VI, XVI, or Paragraph XXIX.G [sic] with respect to injunctive or equitable relief, all disputes and claims relating to this Agreement or any other agreement entered into between the parties, the rights and

---

[15]*Id.*  § XVIII.C.

[16]*Id.* § XVIII.D; *id.*, Exh. D (Collateral Assignment of Lease Agreement).

[17]Plaintiff asserted in its opposition to defendants' first *ex parte* application that this is a typographical error, and that the reference should be "Paragraph XXIX.H," because subparagraph G deals with limitations on damages, wile subparagraph H deals with injunctive and equitable remedies.  (Opposition re: *Ex Parte* Application ("First Opp."), Docket No. 13 (June 16, 2014) at 10 n. 2.)  Defendants do not respond to this assertion in their current application.

[18]Complaint, Exh. A. § XXIX.B.

obligations of the parties, or any other claims or causes of action relating to the making, interpretation, or performance of either party under this Agreement, which are not resolved through mediation, shall be settled by arbitration. . . . Judgment upon the award of the arbitrator shall be submitted for confirmation to the United States District for the Eastern District of Pennsylvania or the United States District Court that has jurisdiction for Franchisor's principal place of business and, if confirmed, may be subsequently entered in any court having competent jurisdiction. This agreement to arbitrate shall survive any termination or expiration of this Agreement."[19]

Section V, titled "Proprietary Marks," states that "[a]ny unauthorized use of the Marks by the Franchisee is a breach of this Agreement and an infringement of the rights of the Franchisor in and to the Marks."[20]  Section VII.C, captioned "Equitable and Legal Remedies," states that the "Franchisor shall be entitled to immediate equitable remedies in addition to the remedies available to it at law such as monetary damages, including but not limited to, restraining orders and injunctive relief in order to safeguard [its] proprietary, confidential, unique, and special information, trademarks, and copyrights[.]"[21] Section XXIX.H provides that "[n]othing contained in this Agreement shall prevent [the] Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect [the] Franchisor's interest."[22]

The agreements include a non-waiver provision requiring that any waiver of rights be memorialized in a written agreement signed by the party against whom relief is sought.  It states:

"No failure of Franchisor to exercise any power reserved to it hereunder, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with the terms hereof. Waiver by Franchisor of any particular default by Franchisee shall not be binding unless in writing and executed by the party sought to be charged and shall not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different nature; nor shall any delay, waiver, forbearance, or omission of Franchisor to exercise any power or rights arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Franchisor's rights

---

[19]*Id.* § XXIX.C.

[20]*Id.* § V.A.

[21]*Id.* § VII.C.

[22]*Id.* § XXIX.H.  The other exceptions to the mediation clause include Section VI, entitled "Company Manuals," and Section XVI, entitled "Covenants," which are not at issue in this action.

5

nor shall such constitute a waiver by Franchisor of any right to declare any subsequent breach or default.  Subsequent acceptance by Franchisor of any payment(s) due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement."[23]

## B.    Evidence Adduced by Plaintiff

Plaintiff requires its franchisees to purchase and install cash registers, or point-of-sale ("POS") systems, in their stores that electronically transmit daily transaction data.[24]  Plaintiff uses this information to calculate the weekly royalties and advertising fund payments owed by franchisees, which are calculated as percentages of gross sales.[25]  Plaintiff then automatically withdraws the sums due from the franchisee's bank account.[26]

Prior to 2007, franchisees were required to use a POS system called a "TEC 1650."  In 2007, plaintiff introduced a more advanced POS system called the "MICROS e7."[27]  It set a November 1, 2012  deadline for franchisees to replace TEC 1650s with MICROS e7 registers.[28]

Both the TEC 1650 and the MICROS registers automatically transmit daily revenue figures to plaintiff, a process known as "polling."[29]  Under the franchisee agreements, franchisees are required to report revenue figures to plaintiff on a weekly basis in the event the POS system malfunctions, is disconnected, and is unable automatically to provide polling data.[30]  If the franchisee fails to report sales figures to plaintiff, plaintiff estimates the amount of sales – and thus the amount of royalties and advertising fund payments due – based on the franchisee's prior revenue history.[31]

---

[23]*Id.* § XXIV.

[24]Declaration of Heather Neary ("Neary Decl."), Docket No. 13-2 (June 16, 2014), ¶ 2.

[25]*Id.,* ¶ 2.

[26]*Id.*

[27]*Id.,* ¶ 3.

[28]*Id.*

[29]*Id.,* ¶ 4.

[30]*Id.*

[31]*Id.*

On July 1, 2013, plaintiff sent defendants a letter placing them in default under the franchise agreements for, among other things, failing to install MICROS registers at their Ontario stores by the November 1, 2012 deadline.[32]  At the time, defendants continued to use two TEC 1650 registers.[33]  Although the registers periodically failed to submit polling data to plaintiff, defendants did not report sales data to plaintiff on a weekly basis; plaintiff cited this failure as a second default.[34]  The notice of default identified several other grounds as well; these included failure to adhere to required food safety and sanitation requirements, to submit a certificate of insurance, and to pay vendors.[35]  Plaintiff had previously declared defendants in default at the Ontario stores on three prior occasions.[36]  Plaintiff notified defendants on July 1, 2013 that the Ontario stores and seven other stores they owned were being audited as a result of alleged revenue reporting irregularities;[37] it asked that defendants provide financial records and other information for 2012 and early 2013.[38]  Plaintiff contends the audit was never completed because defendants did not cooperate or produce the requested information.[39]

On August 16, 2013, plaintiff terminated the franchise agreements for the Ontario stores because defendants had failed to cure the defaults identified in the July 1, 2013 notice.[40]  Defendants were given ninety (90) days – until November 14, 2013 – to sell or close the Ontario stores.[41]  On September 21, 2013, defendants purchased and installed one MICROS register at each of the Ontario stores.[42]  Plaintiff visited the Ontario stores on November 14, 2013, and discovered that defendants continued to use one TEC 1650 register at each of the Ontario stores; the TEC 1650s, moreover, did not appear to be connected to plaintiff's polling system.[43]  On November 19, 2013, plaintiff notified

---

[32]*Id.*, ¶ 5; *id.*, Exh. A.

[33]*Id.*, ¶ 5; *id.*, Exh. A.

[34]*Id.*, ¶ 5; *id.*, Exh. A.

[35]*Id.*, Exh. A.

[36]*Id.*, ¶ 6.

[37]*Id.*, ¶ 7.

[38]*Id.*; *id.*, Exh. A.

[39]*Id.*, ¶ 7.

[40]*Id.*, ¶ 8; *id.*, Exh. B.

[41]*Id.*, ¶ 8; *id.*, Exh. B.

[42]*Id.*, ¶ 9.

[43]*Id.*

defendants that they were required to replace the remaining TEC 1650s with MICROS registers, and extended the termination date to November 27, 2013.[44]  After defendants installed a second MICROS register at each Ontario store on November 23, 2013, plaintiff decided not to terminate the franchise agreements for the two stores, and reinstated them.[45]

On December 3, 2013, Heather Neary, plaintiff's Chief Marketing Officer, and Steve Leasure, its Director of Store Support, met with Carlos Vasquez, a manager of one of defendants' stores, to discuss defendants' use of the TEC 1650 register through November 2013, and defendants' apparent failure to report revenues resulting from sales processed at the TEC 1650 register.[46]  Neary asserts Vasquez told her that Steve Wang had not been following proper revenue reporting procedures with respect to the TEC 1650 register for several years, and that when plaintiff's representative took photographs of the cash deposit logs at the Ontario stores during the November 14, 2013 site visit, he "just knew" that the underreporting scheme had been discovered.  Following the meeting, Neary and Leasure made several trips to the Ontario stores to review paper records of total sales for each store, which they compared with sales figures reported by the MICROS for same period.[47]  They found that revenues had been underreported at the East store by $53,000 for the period from September 21 to November 23, 2013, when a second MICROS register was installed at each store, and by $21,500 at the West store during October 2013.[48]  Plaintiff asserts that during this period, it withdrew royalties and advertising fund payments from defendants' bank accounts based on the lower amounts reported via automatic polling.[49]

Leasure reports that he also performed an analysis comparing weekly sales totals at the Ontario stores for 2012 with totals for the same weeks in 2013 to determine whether reported sales totals had changed significantly after defendants installed the second MICROS registers on November 23, 2013.[50]  Leasure discovered that during the 41 weeks for which data was available at the West store, sales declined from 2012 to 2013 by an average of 19 percent.[51]  He asserts this is evidence of

---

[44]*Id.*; *id.*, Exh. C.

[45]*Id.*, ¶ 10.

[46]*Id.*, ¶ 11.

[47]*Id.*,  ¶¶ 13-14.

[48]*Id.*, ¶¶ 13-14; *id.*, Exhs. F, G.

[49]Declaration of Amanda Allison in Support of Plaintiff's Motion for Preliminary Injunction, Docket No. 20-5 (July 2, 2014), ¶ 4.

[50]Declaration of Steve Leasure ("Leasure Decl."), Docket No. 13-1 (June 16, 2014), ¶ 4.

[51]*Id.*, ¶ 5.

underreporting, because the decline was in contrast to a 2.68 increase in same store sales across the Auntie Anne's system from 2012 to 2013, and because sales at the West store increased by 14 percent from 2012 totals after the second MICROS register was installed.[52]  Leasure performed the same analysis at the East store for the 17 weeks for which sales data was available; he found that sales declined by 26.2 percent from 2012 to 2013, and that average weekly sales increased from $10,000 during the eight weeks prior to installation of the second MICROS register to $26,000 during the first five weeks after the register was installed.[53]

On March 4, 2014, plaintiff sent defendants a letter terminating the franchise agreements for the Ontario stores, citing breaches related to the underreporting of revenue and underpayment of royalties.  The termination was effective immediately, and the letter demanded that defendants turn over possession of the stores to plaintiff.[54]  Plaintiff contends that defendants expressed interest in selling the Ontario stores as a means of resolving the dispute, and it therefore delayed enforcing the termination notice so that an orderly transition to the eventual buyer(s) could take place.[55]  Plaintiff asserts, however, that defendants ceased communicating with it in mid-April 2014.  As a result, plaintiff sent defendants letters on May 8 and May 15, 2014; it stated that because it appeared defendants were no longer pursuing sale of the stores, it was going to proceed with the termination, which required that defendants turn over possession of the stores and cease using plaintiffs' trademarks.[56]  Plaintiff contends that at this point, it stopped withdrawing royalties from defendants' bank accounts, and advised its authorized food supplier that defendants were no longer permitted to order proprietary food products for the Ontario stores.[57]

---

[52]*Id.*, ¶ 6.

[53]*Id.*, ¶ 7.  Leasure states that because defendants did not report sales data for the last five weeks of 2012, he was unable to conduct a year-over-year comparison of sales for the weeks following installation of the second MICROS register.  (*Id.*)

[54]Neary Decl., ¶ 16; *id*, Exh. H.

[55]*Id.*, ¶ 17.

[56]*Id.*, ¶ 18; *id.*, Exhs. I, J.

[57]*Id.*, ¶ 18.

### C.   Evidence Adduced by Defendants

Defendants contend plaintiff has used a dispute concerning royalty underpayments as a pretext to force defendants to sell the Ontario stores or be driven out of business.[58]  They assert that the underpayments are a result of technical problems involving equipment provided by plaintiff, as well as plaintiff's decision to require franchisees to purchase and install expensive new equipment for monitoring sales and calculating royalties.[59]  They also proffer Vasquez's declaration, in which he denies ever having told Neary that defendants were intentionally underreporting sales to plaintiff.[60]

Defendants assert that the amount in dispute totals $10,727.26, a sum they characterize as *de minimis*.[61]  They report that plaintiff has attempted on prior occasions to purchase the Ontario stores, offers defendants rebuffed.[62]  They also state that their former contact at plaintiff, Anne Gettings, told them that plaintiff treated defendants' Ontario stores less leniently than it treated other stores, and that her supervisor, Jackie Geisel, told Gettings numerous times that she "was going to take [defendants] out."[63]  Defendants assert they have significantly grown sales and increased profitability at the Ontario stores, which collectively gross $1.8 million annually.  This makes them among the highest grossing Auntie Anne's franchises on the West Coast.[64]

Defendants maintain that although plaintiff directed them in 2012 to purchase new MICROS registers, they told plaintiff in early 2013 that they wished to purchase only one new register and one less expensive terminal computer for each store to save money.  They contend plaintiff never rejected this proposal.[65]  Defendants state that they experienced connectivity problems with their registers in 2013, which interfered with the automatic reporting of sales data to plaintiff.[66]  Steven Wang asserts he told plaintiff of the connectivity problems on multiple occasions, and directed his employees to

---

[58]Declaration of Steven C. Wang ("Second Wang Decl."), ¶ 3; Application at 2.

[59]Wang Decl., ¶ 22.

[60]Declaration of Carlos Vasquez, Docket No. 14 (June 16, 2014), ¶ 3.

[61]Wang Decl., ¶ 21.

[62]*Id.*, ¶ 7.

[63]*Id.*, ¶ 15.  Defendants state that Ms. Gettings is no longer employed by plaintiff.  (*Id.*)

[64]*Id.*, ¶ 5.

[65]*Id.*, ¶ 12.

[66]*Id.*, ¶ 13.

contact the technical support number for the polling system.[67]  The problems appear to have been related to defendants' continued use of old registers at the Ontario stores, which were incompatible with the modems used with the new registers.[68]  Defendants assert that after plaintiff directed them in November 2013 to install a second new register at each of the Ontario stores, they complied immediately; they contend this was the first time plaintiff rejected their earlier request to forego purchasing two new registers for each store.[69]

On March 11, 2014, defendants sent plaintiff a letter disputing the allegations in the March 4, 2014 termination notice.[70]  Defendants state that they attempted to negotiate a settlement to resolve the unpaid royalties, but refused to accede to plaintiff's demand that they sell the Ontario stores.[71] On May 22, 2014, defendants sent plaintiff a letter asserting that plaintiff had breached the franchise agreements, and that they were invoking the provision in the agreements requiring mediation.[72] They assert that plaintiff has not responded to the mediation demand.[73]  Plaintiff commenced this action on May 23, 2014; on June 9, 2014, it disconnected the polling systems used at defendants' Ontario stores.

Defendants proffer a spreadsheet detailing daily gross sales at each register in the two Ontario stores.[74]  According to defendants' data, the East store recorded $150,510 in sales in October and November 2013, while the polling numbers reflected sales of $101,013.  The West store recorded $160,257 in sales, while the polling data showed sales of $107,153.[75]

Defendants seek a temporary restraining order enjoining plaintiff from (1) abrogating the dispute resolution process mandated by the franchise agreements, (2) cutting off supplies to the

---

[67]*Id.*

[68]*Id.*

[69]*Id.*, ¶¶ 12, 14.

[70]Declaration of Gabriel Colwell ("Colwell Decl."), Docket No. 10-1 (June 13, 2014).

[71]*Id.*, ¶ 4.

[72]*Id.*, ¶ 5, Exh. C.

[73]*Id.*, ¶ 8.

[74]Wang Decl., Exh. A.

[75]*Id.* at 32, Exh. B at 83.

Ontario stores, (3) removing signage and other branded materials from the stores, and (4) terminating the franchise agreements.[76]

## II.   DISCUSSION

### A.   Legal Standard Governing Issuance of Temporary Restraining Orders

The standard for issuing a temporary restraining order ("TRO") is the same as that for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *Ali v. United States*, 932 F.Supp. 1206, 1208 (N.D. Cal. 1996). A "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 676 (2008), and a district court should enter preliminary injunctive relief only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Such a showing requires that the party establish it is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. See *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest"). See also *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest,'" quoting *Winter*, 555 U.S. at 20); *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," citing *Winter*, 555 U.S. at 20); *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1182 (E.D. Cal. 2009) ("Pursuant to *Winter*, [p]laintiffs must make a clear showing that they are likely to succeed on the merits").

Plaintiff contends that the court should apply a more stringent standard to defendants' application because it seeks mandatory, rather than prohibitory, relief. Where a party seeks injunctive relief requiring affirmative conduct that goes well beyond the status quo, courts apply a more stringent standard. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) ("In cases such as the one before us in which a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction"); *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo Pendente lite, is

---

[76]Application at 2; [Proposed] Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction, Docket No. 26-4 (July 10, 2014) at iii.

particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party"); *Mitchell v. Cate*, No. 2:08–CV–01196, 2014 WL 2895232, *3 (E.D. Cal. June 25, 2014) ("'An even more stringent standard is applied where mandatory, as opposed to prohibitory, preliminary relief is sought,'" quoting *Rouser v. White*, 707 F.Supp.2d 1055, 1061 (E.D. Cal. 2010)).[77]

The status quo ante is "the situation that existed between the parties immediately prior to the events that precipitated the dispute." *Asa v. Pictometry Intern. Corp.*, 757 F.Supp.2d 238, 243 (W.D.N.Y. 2010). See also *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring) ("'Status quo' does not mean the situation existing at the moment the law suit is filed, but the last peaceable uncontested status existing between the parties before the dispute developed" (internal quotation marks omitted)), aff'd and remanded, 546 U.S. 418 (2006); *LaRouche v. Kezer*, 20 F.3d 68, 74 n. 7 (2d Cir. 1994) (the "'[s]tatus quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy," quoting BLACK'S LAW DICTIONARY 1410 (6th ed.1990))*; United Steelworkers of Am., AFL–CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (Breyer, J.) (concluding that an injunction requiring the payment of insurance premiums was properly viewed "not as mandatory, but as prohibitory" where the last uncontested status that preceded the pending controversy was a status in which the defendant paid the necessary premiums). Defendants seek an order that, *inter alia*, requires plaintiff to direct its suppliers to resume shipments to the Ontario stores. Because this relief seeks merely to reverse action plaintiff took after terminating the franchise agreements – the event that gave rise to the parties' dispute – the relief defendants seek is prohibitory, not mandatory.[78]   Accordingly, the court need not apply a heightened standard to defendants' application.

### B.   Whether Defendants Have Demonstrated that They Are Entitled to Preliminary Injunctive Relief

#### 1.   The Likelihood that Defendants Will Suffer Irreparable Harm

A party seeking a temporary injunction must show more than a "possibility" of irreparable injury; it must demonstrate that irreparable injury is "likely" in the absence of preliminary injunctive relief. *Winter*, 555 U.S. at 22; *American Trucking Associations*, 559 F.3d at 1052; see also 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1, p. 139 (2d ed.1995)

---

[77]A mandatory injunction is one that requires that a responsible party "take action." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). In contrast, a prohibitory injunction is one that "restrains" a responsible party from taking further action. *Id.*

[78]The remaining types of orders defendants seek are also primarily prohibitory. They seek to have the court restrain plaintiff from removing trademarked and other branded materials from the stores and from taking additional action to effectuate a termination of the franchise agreements.

(stating that an applicant must demonstrate that in the absence of preliminary relief, he "is likely to suffer irreparable harm before a decision on the merits can be rendered").

It is not enough that the claimed harm be irreparable; it must be imminent as well. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Los Angeles Memorial Coliseum v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). "[E]stablishing a threat of irreparable harm in the indefinite future is not enough." *Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 456 Fed. Appx. 676, 679 (9th Cir. Oct. 31, 2011) (Unpub. Disp.); see also *Cal. Dump Truck Owners Ass'n v. Nichols*, No. 11–cv–00384–MCE–GGH, 2012 WL 273162, *3 (E.D. Cal. Jan. 30, 2012) (quoting *Amylin*). Speculative injury does not constitute irreparable injury that warrants entry of a temporary restraining order or preliminary injunction. *Carribean Marine Servs.*, 844 F.2d at 674 (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)).

"A [party] must do more than merely allege imminent harm . . . ; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id.* (emphasis original). The showing must be made by adducing probative evidence. *Am. Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing the entry of a preliminary injunction because the movant had adduced no evidence of irreparable harm); *Bell Atlantic Business Systems, Inc. v. Storage Tech. Corp.*, No. C–94–0235, 1994 WL 125173, *2-4 (N.D. Cal. Mar. 31, 1994) (denying a motion for preliminary injunction because the movant had not adduced sufficient evidence of irreparable harm). Conclusory affidavits are insufficient to demonstrate irreparable harm. *Am. Passage Media Corp.*, 750 F.2d at 1473.

Defendants assert that the imminent destruction of their business constitutes irreparable harm. Although economic injury alone does not constitute irreparable harm, damage to a business's reputation and goodwill is irreparable because it unquantifiable, and thus cannot be fully remedied by financial damages. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("It is true that economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award. However, we have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm" (citation omitted)); *Skydive Ariz., Inc. v. Quattrocchi*, No. CV–05–2656–PHX–MHM, 2010 WL 1743189, *2 (D. Ariz. Apr. 29, 2010) ("Injuries to goodwill and business reputation are generally considered to be intangible and, as a result, irreparable"); *Mahroom v. Best Western Intern., Inc.*, No. C 07–2351 JF (HRL), 2009 WL 248262, *3 (N.D. Cal. Feb. 2, 2009) ("'Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury,'" quoting *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995)); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 616 F.Supp.2d 958, 974 (D. Ariz. 2009) (finding irreparable injury because plaintiff could not "determine the extent of damage caused by [defendant] to [plaintiff's] reputation and customer goodwill"); *MySpace, Inc. v. Wallace*, 498 F.Supp.2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered

14

irreparable"); see also *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury").

If defendants run out of food supplies, and they are unable to fill orders, the business reputation of the Ontario stores will suffer and customer goodwill will be lost.  If forced to close or sell the stores, defendants will likely suffer additional irreparable harm in light of their long tenure as the stores' owners.  See *Mahroom*, 2009 WL 248262 at *3 ("Finally, the Mahrooms' long tenure as a Best Western member may prove to be an intangible benefit that may be preserved only through full reinstatement into the BWI membership program"); see also *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) ("[T]he right to continue a business in which [plaintiff] had engaged for twenty years . . . is not measurable in monetary terms").

In its June 18 Order, the court found that defendants had failed to adduce evidence of imminent harm because while they asserted that their supplies were "rapidly diminishing," they adduced no evidence as to when supplies would be exhausted.[79]  Defendants support their second application with a supplemental declaration from Steven Wang, stating that the Ontario stores will run out of supplies within five to seven days and be forced to close.[80]  Wang proffers detailed inventory sheets listing the number of days remaining for various supplies, and reflects that the supply of several products has already been exhausted.[81]  Wang states that he has been transferring supplies to the Ontario stores from his other Auntie Anne's stores in Brea and Temecula, but that this solution is untenable because of the distance separating the stores and the fact that plaintiff has demanded that he cease using supplies delivered to the Brea and Temecula stores to restock the Ontario stores.[82]  Although Wang's declaration was unsigned, defendants filed an errata on July 14, 2014, attaching a signed copy.[83]

---

[79]Order at 6-7.

[80]Second Supplemental Declaration of Steven C. Wang, Docket No. 26-1 (July 10, 2014), ¶ 13.

[81]*Id.*, Exhs. C, D.

[82]*Id.*, ¶ 12.

[83]Notice of Errata Re: Docket No. 26-1, Docket No. 30 (July 14, 2014).  The court could nonetheless have considered the factual statements in the unsigned declaration and the exhibits attached thereto because a court is permitted to consider inadmissible evidence at the preliminary injunction stage.  See, e.g., *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir.1988) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction"); *Flynt Distributing Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir. 1984) ("[t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial"); *Ossur Holdings, Inc. v. Bellacure, Inc.,* Case No. 05-1552-JLR, 2005 WL 3434440, *3 (W. D. Wash. Dec. 14, 2005)

Plaintiff argues that it is clear from the quantities of supplies that have been ordered for the Brea and Temecula stores that defendants have been supplying product to the Ontario stores that they have ostensibly ordered for the Brea and Temecula stores.[84]  Although Wang contends that continuing to do so is "untenable," because supplies are being exhausted "at a precipitous rate," and because the distance between the Ontario stores and Brea and Temecula makes transporting supplies from the other two stores "extremely difficult," he does not, as plaintiff notes, state that he will honor plaintiff's demand that he cease using supplies delivered to Brea and Temecula in the Ontario stores.[85]  Based on a comparison of the amounts recently ordered for the Brea and Temecula stores that plaintiffs challenges as abnormal, and the amount of inventory that Wang reports is on hand at the Ontario stores, however, it does not appear that defendants can avoid closing the Ontario stores by continuing to order supplies for them through the Brea and Temecula stores.  Because Wang's declaration indicates that defendants will shortly be forced to close the Ontario stores due to lack of

---

("[d]efendants move to strike exhibits submitted by [plaintiffs] on the basis that [p]laintiffs failed to sufficiently authenticate their submissions.  The court denies [d]efendants' request as the court has discretion to consider even inadmissible evidence for purposes of a preliminary injunction motion"); *Bauman v. DaimlerChrysler AG*, No. C-04-00194 RMW, 2005 WL 3157472, * 5 (N.D. Cal. Nov. 22, 2005) ("District courts have discretion to consider otherwise inadmissible evidence in ruling on an application for a temporary restraining order or preliminary injunction"); *Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 966 n. 1 (C.D. Cal. 2002) (same); see also *Cobell v. Norton,* 391 F.3d 251, 261 (D.C. Cir. 2004) (holding that district court erred when it refused to consider a declaration submitted in support of preliminary injunction that did not comply with the requirements of Rule 56(c)(4) and noting that "[a] preliminary injunction is just that – preliminary.  It does not substitute for a trial, and its usual office is to hold the parties in place until a trial can take place; the proceedings are streamlined, intentionally, because the fuse is often so short"); 11A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2949 (2d ed. 2014) (noting that compliance with evidentiary standards like 56(c)(4) should normally not be required in the preliminary injunction context because preliminary injunctions "neither replace[ ] the trial nor represent[ ] an adjudication of the merits," and that "the urgency that necessitates a prompt determination of the preliminary-injunction application may make it more difficult to obtain affidavits from people who are competent to testify at trial and thus more appropriate to decide a Rule 65(a) request without them").  "The weight to be accorded such evidence is a matter for the Court's discretion." *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 356 n. 4 (C.D. Cal. 1982).

[84]Declaration of Steve Leasure in Support of Plaintiff Auntie Anne's, Inc.'s Opposition to Defendants' [Second] *Ex Parte* Application for Issuance of a Temporary Restraining Order ("Leasure Second Decl."), ¶ 2 and Exh. A.

[85]See Wang Decl., ¶ 12; see also Opp. at 19.

merchandise, with the attendant loss of business reputation and customer goodwill, the court concludes that they have shown that they face imminent irreparable harm if an injunction is not entered.[86]

### 2.     The Likelihood Defendants Will Succeed on the Merits

As noted, defendants allege claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the UCL.  Specifically, they assert that plaintiff breached the franchise agreements by (1) terminating the franchise agreements for the Ontario stores without cause; (2) terminating the franchise agreements for the Ontario stores without providing notice and an opportunity to cure, as required by § XVII of the agreements; (3) terminating the franchise agreements for the Ontario stores while still withdrawing royalty payments from the Wangs' bank accounts for sales at the Ontario stores; (4) initiating this action without first complying with Section XXIX.B. of the franchise agreements, and (5) instructing suppliers to cease delivery of necessary inventory and supplies to the Ontario stores.[87]

### a.     Alleged Breach of the Mediation/Arbitration Provision

Defendants contend that under Sections XXIX.B and XXIX.C, plaintiff breached the franchise agreements by filing this action without first mediating and arbitrating the parties' dispute.  Plaintiff counters that the franchise agreements contain express carve-outs from the mediation/arbitration provisions for actions seeking injunctive and equitable relief.[88]  Plaintiff asserts that its action for injunctive relief falls within this exception, and thus that the mediation/arbitration provision does not apply. The court agrees in part, and disagrees in part.

Neither party argues or proffers evidence concerning the parties' intent in agreeing to Section XXIX.H.[89]  If the court were to interpret Section XXIX.H as broadly as plaintiff advocates, however, it would, to a substantial degree, vitiate the arbitration provision entirely.  This is because the majority of disputes arising under franchise agreements of this kind involve decisions by the franchisor to

---

[86]Given this finding by the court, it need not address defendants' argument that they will suffer irreparable harm because, even if they prevail, they will not be fully compensated for any monetary losses as a result of Section XXIX.C of the franchise agreements.

[87]Answer, ¶ 38; Application at 18.

[88]Opp. at 18.

[89]The court appreciates that the franchise agreement was drafted by plaintiff, and in all likelihood, was not subject to substantial, or any, negotiation.  Nonetheless, the goal of contract interpretation is to determine the mutual intent of the parties.  Consequently, the court frames the issue in that way.

terminate the franchisee, with the attendant right to prohibit the franchisee from continuing to use the franchisor's trademarks and proprietary materials.  In the court's experience, when a franchisee disputes the grounds for termination, the franchisee often refuses to cease operating the location in question as a franchise location, and to stop using the franchisor's trademarks and proprietary materials.  This, of course, results in the franchisor seeking injunctive relief to prevent continued use of the trademarks and proprietary materials and continued branding of the location as a franchise.  If in every instance where plaintiff sought this type of relief, it could avoid the effect of the arbitration provision, the provision would be, if not completely, then in substantial degree, illusory.

This leads the court to conclude that the provision is more probably intended to permit plaintiff to seek limited relief in a court of law – i.e., an injunction – pending a decision on such relief by the arbitrator of the underlying claims.[90]  See *Toyo Tire Holdings of Americas Inc. v. Continental Tire North America, Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) ("[A] district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process – provided, of course, that the requirements for granting injunctive relief are otherwise satisfied");[91] *Holyfield v. Julien Entertainment.com, Inc.*, No. CV

---

[90]The same is true of other provisions in the agreement that address the right to seek injunctive or equitable relief.  See Section VII.C ("Due to the special and unique nature of the Confidential Information, Marks, patents and copyrights, if any, and Company Manuals of Franchisor utilized in the System, Franchisee hereby acknowledges that Franchisor shall be entitled to immediate equitable remedies in addition to the remedies available to it at law such as monetary damages, including but not limited to, restraining orders and injunctive relief in order to safeguard such proprietary, confidential, unique, and special information, trademarks, and copyrights, if any, of Franchisor, and that money damages alone would be an insufficient remedy with which to compensate Franchisor for any breach of the terms of Section V, VI, and VII of this Agreement"); Section XVII.C.2 ("Franchisee agrees that, upon the occurrence of an Event of Default, which in the opinion of Franchisor, is detrimental or harmful to the good name, goodwill, or reputation of Franchisor, to the Marks, to the Franchisor's products, or to other franchisees, or to the public, Franchisor shall be entitled to immediate remedies including but not limited to restraining orders to safeguard the Franchisor or other Franchisees, the Marks or the public.  Such remedies shall be cumulative and in addition to any other remedies available to Franchisor").  These provisions must be read in a way that gives effect to all other provisions in the agreements if possible.  See, e.g., *Neal D. Ivey Co. v. Franklin Associates, Inc.*, 370 Pa. 225, 231-32 (1952) (in construing a contract every one of its provisions must be given effect if possible and the intent of the parties must be ascertained from the instrument as a whole).

[91]In *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999), the Ninth Circuit held that a district court does not abuse its discretion when it refers a preliminary injunction motion to an arbitral forum competent to hear the application:

"The district court correctly denied Simula's request for a preliminary injunction, since provisional relief is available from the Swiss Arbitral Tribunal.  On their face, the

12–9388 CAS (FFMx), 2012 WL 5878380, *3 n. 3 (C.D. Cal. Nov. 21, 2012) ("[C]ourts may issue injunctions preserving the status quo pending arbitration even when arbitration provisions do not expressly allow the parties to pursue this relief"). See also *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986) (holding that "a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied. . . . We believe that the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration"); *Roso-Lino Bev. Distrib. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir. 1984) (reversing the district court's denial of a motion for preliminary injunction and stating that "[t]he fact that a dispute is to be arbitrated . . . does not absolve the court of its obligation to consider the merits of a requested preliminary injunction"); *Sauer-Getriebe KG v. White Hydraulics., Inc.*, 715 F.2d 348, 350 (7th Cir. 1984) (holding that a plaintiff's "right to seek injunctive relief in court and its right to arbitrate are not incompatible").

The relief that plaintiff seeks in its complaint is not interim relief pending submission of a request for injunctive relief to the arbitrator. Nor does anything in plaintiff's complaint contemplate the submission of the parties' dispute to arbitration. It thus appears that defendants may well be able to prevail on the merits of their claim that plaintiff breached the franchise agreements by failing to comply with the mediation/arbitration provision.

---

International Chamber of Commerce ("ICC") Rules of Arbitration hold that the Arbitral Tribunal can provide interim and/or conservatory relief. . . . On this basis alone, the district court did not abuse its discretion in denying Simula's request for a preliminary injunction.

Because the district court correctly concluded that all of Simula's claims were arbitrable and the ICC arbitral tribunal is authorized to grant the equivalent of an injunction *pendente lite*, it would have been inappropriate for the district court to grant preliminary injunctive relief. Therefore, we affirm the district court's denial of preliminary injunctive relief." *Id.* at 725-26.

In *Toyo*, the court held that nothing in *Simula* prevented a district court from granting interim relief . . . to maintain the status quo while the parties are awaiting the creation of an arbitration panel and a decision by that panel with respect to injunctive relief." *Toyo*, 609 F.3d at 980. Thus, where, as here, the parties have agreed to arbitrate under the Commercial Arbitration Rules of the American Arbitration Association, and those rules permit an arbitrator to "take whatever interim measures he or she deems necessary, including injunctive relief . . . ," AAA COMM. ARB. RULES, R-37, the court can enter interim relief as appropriate pending a decision on requests for injunctive relief by the arbitrator.

###### b.    Alleged Breach of Termination with Cause Provision, Notice and Opportunity to Cure Provision, and Supplier Provisions

As noted, the franchise agreement provides various grounds constituting an Event of Default as to which no opportunity to cure is afforded.  These include a franchisee's failure to pay monies owed when due, submitting on two or more occasions information understating gross sales by more than two percent for any period aggregating three weeks or more, and maintaining false books or records or submitting false statements to the franchisor knowingly.[92]  The agreements provide that upon the occurrence of an Event of Default, the franchisor may authorize its distributors to withhold shipment of its proprietary products.[93]  Thus, if defendants defaulted on any of these grounds, their claim that plaintiff breached the franchise agreements by terminating without cause and without notice and an opportunity to cure will fail, as will their claim that plaintiff breached the franchise agreements by directing supplied to cease delivering product to them.

Based on the evidence presently before the court, it concludes that defendants are not likely to prove that plaintiff breached the termination with cause and without opportunity to cure provisions of the agreements.  For the same reason, it does not appear that defendants can show plaintiff breached the provision that permits it to direct suppliers to withhold shipments of proprietary products upon the occurrence of an Event of Default.  Plaintiff asserts that defendants failed to report complete sales totals between September and November 2013; based on his analysis, Leasure asserts they were underreporting sales data for the entire year.  Defendants do not dispute that they did not report all their sales to plaintiff during the three-month period.  They assert, however, that the unreported amounts were *de minimis*.[94]  Defendants also dispute plaintiff's assertion that the unreported sales exceeded the two percent threshold; they state that the total amount of unpaid royalties was 0.5 percent of annual gross sales, a figure they obtained by dividing the amount of royalties due by total annual gross sales.[95]  The franchise agreement, however, states that failure to report or underreporting exceeding 2 percent of *gross sales* constitutes an Event of Default.[96]  Even accepting defendants' figures – which differ from plaintiff's[97] – the amount of unreported sales exceeded two percent of total gross sales.

---

[92]Complaint, Exh. A § XVII.B.1(b), (e), (s).

[93]*Id.* § XVII.C.1(a).

[94]Application at 12.

[95]*Id.* at 3, 21.

[96]Complaint, Exh. A § XVII.B.1(e) (emphasis added).

[97]See Neary Decl., ¶ 13.

Defendants argue that they did not affirmatively report sales to plaintiff because all sales reports were transmitted automatically through the computerized polling system,[98] which experienced technical problems.  This argument is unavailing.  First, defendants had an affirmative obligation under the franchise agreements to ensure that all sales data was accurately reported; by continuing to use TEC 1650 registers after plaintiff implemented the MICROS e7 system, defendants knew there was a significant possibility that they were not providing accurate sales information.[99]  Defendants do not assert that they were unaware their TEC 1650 registers were not polling sales data;[100] to the contrary, Steven Wang states that he contacted plaintiff in an effort to resolve the problems and directed his employees to call the technical support line.[101]  Plaintiff, moreover, notified defendants on July 1, 2013 that weekly sales data was missing and that they had to input the missing information

---

[98]Application at 21.

[99]In a reply filed July 14, 2014, defendants deny that the franchise agreement imposes a duty on the franchisee to continue reporting revenue figures to plaintiff in the event a POS register malfunctions or becomes disconnected from the automatic polling system.  (Response in Support of *Ex Parte* Application, Docket No. 31 (July 14, 2014) at 3, 8.)  They cite § X.A.A.1 of the franchise agreements, which states that "[f]ranchisee will make available to Franchisor all original books and records that Franchisor may deem necessary to ascertain Franchisee's Gross Sales for reasonable inspection at reasonable times."  That section also states that

> "[o]n or before Tuesday of each week, Franchisee will submit to Franchisor on a form approved by Franchisor, a correct statement, signed by Franchisee, of Franchisee's Gross Sales for the preceding week ending on the close of business on Saturday.  Each weekly statement of Gross Sales shall be accompanied by the Continuing Services and Royalty Fee payment based on the Gross Sales reported in the statement so submitted.  Each weekly statement must be accompanied by a cash register tape verifying Franchisee's weekly sales.  Franchisor reserves the right to require Franchisee to remit the Continuing Services and Royalty Fee pursuant to electronic funds transfer or other electronic means."

The language defendants cite does not operate to the exclusion of the rest of § X.A.A.1, which imposes on franchisees a continuing duty to submit weekly reports of gross sales data.

[100]In their reply, defendants assert that the "root cause of this entire dispute" is plaintiff's decision to move to the MICROS polling system.  (Reply at 4.)  Plaintiff had a right to change the polling system.  Defendants were told that they needed to install new MICROS registers at their stores.  They unilaterally determined to replace only one of two registers at each store.  While they contend that they asked for a waiver of this requirement with respect to the second register at each store, and that plaintiff did not respond to the request in a timely fashion, they knew they had an obligation to report accurate sales, and that the presence of the TEC 1650 registers potentially imperiled their ability to do so electronically.

[101]Wang Decl., ¶ 13.

manually into the electronic polling system.[102]  It appears likely, therefore, that defendant will not be able to show that they did not breach Sections XVII.B.1.e and XVII.B.1.s of the franchise agreements.

Defendants next assert that they did not refuse to pay plaintiff all monies due because royalties were automatically withdrawn from their bank account.[103]  This argument too fails, as the amount withdrawn from defendants' account was based on reported sales figures; as a result, the fact that defendants underreported gross sales led to the underpayment of royalties and advertising fund contributions.[104]  For this reason, it does not appear likely that defendants will be able to show that they did not breach Section XVII.B.1.b of the franchise agreements.

Under Section XVII.B.1, each of these asserted breaches of the franchise agreements is an Event of Default as to which plaintiff need not give defendants an opportunity to cure.  Thus, it does not appear that defendants will be able to demonstrate that plaintiff violated the provision in the franchise agreements that required that it give defendants thirty days to cure the default.

Defendants contend that plaintiff waived any breaches associated with the September/October 2013 time period, because it notified defendants that all purported defaults under the franchise agreements that predated November 23, 2013 had been cured.[105]  Although the court has reviewed all of the evidence in the record, it finds no proof that plaintiff told defendants that all purported defaults under the franchise agreements prior to November 23, 2013 had been cured.  Rather, the available evidence shows that plaintiff elected to withdraw the termination notice after defendants installed a second MICROS e7 register at both of the Ontario stores.[106]  Plaintiff asserts that thereafter, it learned that the underreporting of revenue for the September-November 2013 time

---

[102]Neary Decl., Exh. A.

[103]Application at 21.

[104]Defendants challenge the results of plaintiff's audit of unpaid royalties on the ground that it is based on a 7 percent royalty rate, rather than the 6 percent rate alleged in the complaint. (Application at 6; see also Allison Decl., ¶ 2, Exhs. A, B.)  As noted, however, the franchise agreements authorize plaintiff to increase the royalty rate up to 7 percent at its sole discretion. (Complaint, Exh. A § X.A.)

[105]Application at 18.

[106]Neary Decl., ¶ 10 ("The Wangs installed a second MICROS register at each of the Ontario Mills stores on or about November 23, 2013, and, as a result, Auntie Anne's decided not to pursue efforts to enforce the termination even though some of the other defaults described in the July 1, 2013 default notice had never been cured. . .").

period was more substantial than it had previously believed.[107]   Consequently, on March 4, 2014, plaintiff sent a new termination notice.[108]

Under certain circumstances, treating a contract as binding despite full knowledge of a breach may waive rights arising from the breach.  See *Leiter v. Eltinge*, 246 Cal.App.2d 306, 317 (1996) ("[T]reating the contract as binding after full knowledge of the breach, is a waiver of the right to rescind the contract for the material breach. Since plaintiff elected to treat the contract as still alive and viable and accepted further performance from defendant Hunsaker, the rule is well-established he waived the right to hold defendant Hunsaker for damages for the breach").  See also *Honesdale Ice Co. v. Lake Lodore Improvement Co.*, 232 Pa. 293, 299 (1911).  Under California law,

> "waiver is the intentional relinquishment of a known right after knowledge of the facts. The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.  The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right."  *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 41 (1995) (brackets, internal quotation marks, and citations omitted).

See also *Commonwealth v. Gribble*, 580 Pa. 647, 677 (2004) (same).

The franchise agreements contain a non-waiver provision, which requires that any waiver of plaintiff's rights be in writing and signed by plaintiff.[109]   Non-waiver clauses themselves can be waived, however.  *Bettelheim v. Hagstrom Food Stores*, 113 Cal.App.2d 873, 878 (1952) ("Even a waiver clause may be waived by conduct"); see *Regency Apartments v. Guerra*, No. BV 027502, 2008 WL 8980716, *2 (Cal. App. Oct. 6, 2008) (Unpub. Disp.) ("In the absence of any evidence of conduct by plaintiff reflecting a contrary intent, the eight-year lapse of time before attempting to invoke the anti-waiver clause, supports the inference that plaintiff likewise waived the anti-waiver clause of the rental agreement").[110]   See also *Gough v. Halperin*, 306 Pa. 230, 234 (1932) (same).

---

[107]*Id.*, ¶¶ 13-14.

[108]*Id.*, ¶ 16.

[109]Complaint, Exh. A § XXIV.

[110]"Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

Nonetheless, the existence of such a clause supports a reasonable inference plaintiff did not intend to waive any provision of the franchise agreements unless it expressed such an intent in writing.  See *Salton Community Services Dist. v. Southard*, 256 Cal.App.2d 526, 530 (1967) (holding that a clause in a lease stating that the landlord's "'subsequent acceptance of rent hereunder . . . shall not be deemed to be a waiver of any prior occurring breach,'" was a sufficient basis upon which to sustain a demurrer to a waiver defense based on the landlord's acceptance of rent); see also *Gould v. Corinthian Colleges, Inc.*, 192 Cal.App.4th 1176, 1180 (2011) (stating that an anti-waiver provision "militate[s] against a finding of waiver under most circumstances").

As noted, plaintiff asserts it was unaware of the extent of defendants' underreporting of sales when it elected to reinstate the franchise agreements in November 2013, and that it only discovered the full extent of the underreporting following its site visit to the Ontario stores in December 2013.[111] Indeed, the fact that less than two weeks after it reinstated the franchise agreements, plaintiff visited the Ontario stores to continue its investigation of underreported sales[112] and that it continued to investigate the matter in January 2014 is conduct that is inconsistent with defendants' assertion that plaintiff waived its right to assert the issue.  Because defendants adduce no evidence – let alone clear and convincing evidence – that plaintiff had full knowledge in November 2013 of the extent of the underreporting, or that it engaged in a course of conduct that gives rise to an inference that it waived the non-waiver clause, they have failed to carry their burden of demonstrating that plaintiff waived the non-waiver clause and its right to terminate the agreements due to underreporting of sales.

Defendants also contend that plaintiff breached the franchise agreements by directing its supplier to cease delivering product to the Ontario stores.  Section XVII.C.1 of the franchise agreements states that "[u]pon the occurrence of an Event of Default, Franchisor, in its discretion, may (a) authorize its distributors to withhold shipment to the Franchise of the Franchisor's proprietary products until such time as Franchisee has cured the Event of Default, and/or (b) [i]mmediately terminate this Agreement by giving written notice of termination to Franchisee.  Upon termination, Franchisor may exercise any and all of its rights and remedies afford by federal, state and local law."[113]  Because it does not appear likely that defendants will be able to show that plaintiff breached the franchise agreements by terminating them, or that they did not engage in conduct that constituted an Event of Default under the agreements, plaintiff will likely show that it had a contractual right to direct suppliers to withhold product from defendants.  In this event, defendants will be unable to show that plaintiff's direction to the suppliers breached the franchise agreements.

---

[111]Opposition at 17.

[112]See Neary Decl., ¶¶ 11-12.

[113]Complaint, Exh. A § XVII.C.1.

For all of these reasons, the court finds that defendants are unlikely to prevail on their claims that plaintiff breached the termination with cause provision, the notice and opportunity to cure provision, or the supplier provision of the franchise agreements.

### c.     Alleged Breach by Collecting Royalties Following Termination

Defendants are also unlikely to prevail on their claim that plaintiff continued to collect royalty payments after it terminated the agreements.  Plaintiff states that after it notified defendants of the termination in March 4, 2014,  defendants expressed interest in selling the Ontario stores as a means of resolving the dispute, and it therefore delayed enforcement of the termination notice so that an orderly transition to an eventual buyer could take place.[114]  Plaintiff did not direct its suppliers to cease deliveries to the Ontario stores until it concluded that defendants were not pursuing a sale.  It was at this point that it ceased collecting royalty payments.[115]  So long as defendants were operating the stores as franchisees with plaintiff's concurrence, plaintiff was entitled to collect royalties under the agreements.

### 3.     The Balance of Hardships and the Public Interest

Defendants' failure to show that they are likely to succeed on the merits of all claims except breach of the mediation/arbitration provision dooms their application.  Under *Winter*, a plaintiff seeking a preliminary injunction must make an appropriate showing on each of the four relevant factors in order to prevail.  555 U.S. at 20; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (" *Winter* . . . requires the plaintiff to make a showing on all four prongs").  Even under "sliding scale" analysis, a party must, "at a minimum, raise[ ] 'serious questions' on the merits of its claim" to prevail.  *Alliance for the Wild Rockies*, 632 F.3d at 1137.  See *Global Horizons, Inc. v. United States DOL*, 510 F.3d 1054, 1058 (9th Cir. 2007) ("To reach this sliding scale analysis, however, a moving party must, at an irreducible minimum, demonstrate some chance of success on the merits").  Because defendants have not shown that they are likely to succeed on the merits on the bulk of their affirmative claims, the court is unable to grant injunctive relief, and thus need not address the remaining factors as to those claims.  *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011) ("[I]f a plaintiff fails to show that he has some chance on the merits, that ends the matter"); *Global Horizons*, 510 F.3d at 1058 ("Once a court determines a complete lack of probability of success, its analysis may end, and no further findings are necessary").  See *Oregon Coast Scenic R.R. LLC v. Oregon, Dept. of State Lands*, No. 3:14–cv–00414–HZ, 2014 WL 1572445, *2 (D. Or. Apr. 18, 2014) ("'Once a court determines a complete lack of probability of success, its analysis may end, and no further findings are necessary.'  That is the case here," quoting *Global Horizons*); *Christie v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 8:12–cv–01584–ODW (JPRx), 2012 WL 5363368, *5 (C.D. Cal. Oct. 30, 2012) ("Because Christie

---

[114]Neary Decl., ¶¶ 17-18.

[115]*Id.*

has not established a likelihood of success on the merits, the Court does not reach the remaining injunctive-relief factors"); *Aniel v. GMAC Mortg., LLC*, No. C 12–04201 SBA, 2012 WL 5373388, *8 (N.D. Cal. Oct. 30, 2012) ("In sum, because Plaintiffs have not met their burden to establish a likelihood of success on the merits or raised 'serious questions' going to the merits, and because they must show each of the requisite elements to obtain a TRO under the *Winter* standard, a TRO is not warranted"); *Guendl v. Wells Fargo Bank, N.A.*, No. C11–2086RAJ, 2012 WL 1181744, *3 (W.D. Wash. Apr. 9, 2012) ("Ms. Guendl's failure to establish serious questions about the merits of her claims makes it unnecessary to consider other elements of the preliminary injunction standard").

The court has found, in contrast, that defendants have shown they can likely prove that plaintiff breached the mediation/arbitration provision of the agreement. A breach of this provision, however, if proved, would not entitle defendants to all of the relief they seek in their application. Specifically, it would not support entry of an injunction restraining plaintiff from terminating the franchise agreements, directing suppliers to cease delivering product to defendants' Ontario stores, or from removing signage and other branded materials from the stores. Rather, defendants would be entitled to an injunction requiring that plaintiff mediate the dispute and if the mediation is unsuccessful, that it arbitrate as required by the agreement. Consequently, the court will enter an order requiring that plaintiff immediately mediate its dispute with defendants and if the mediation is unsuccessful, that it cooperate in arbitrating the dispute.

As to this last aspect of defendants' application, the court concludes that both the balance of hardships and the public interest favor entry of an injunction. First, defendants are entitled to rely on the dispute resolution provisions of the agreement and to invoke the preliminary and potentially less costly mechanisms they contemplate. Plaintiff, moreover, will be required to do only what it agreed to do – in a contract drafted primarily, if not completely, by it. Second, there is a strong federal policy favoring arbitration. See, e.g., *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 81 (2000) ("To invalidate the agreement would undermine the liberal federal policy favoring arbitration agreements"); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 471 (9th Cir. 1991) (noting the "strong federal policy favoring arbitration"). Consequently, all of the relevant factors favor entry of such an injunction.

### III.  CONCLUSION

For the reasons stated, defendants' application for a temporary restraining order is granted in part and denied in part. The court denies defendants' application for a temporary restraining order prohibiting plaintiff from terminating the franchise agreements, directing suppliers to cease delivering product to defendants' Ontario stores, and from removing signage and other branded materials from the stores. Given the deficiencies in their showing, the court also denies their application for an order to show cause why a preliminary injunction of this type should not issue. See, e.g., *Digital Communications Network, Inc. v. AB Cellular Holding LLC*, No. 99-5418 CM (AJWx), 1999 WL 1044234, *2 (C.D. Cal. Aug. 19, 1999) (denying a party's application for both a temporary

restraining order and an order to show cause re preliminary injunction); *Fowler v. United States*, 258 F.Supp. 638, 643 (C.D. Cal. 1966) (declining to issue either a temporary restraining order or an order to show cause re preliminary injunction because "plaintiff . . . made absolutely no showing of any facts that would warrant" such relief).

The court grants so much of defendants' application as seeks an order requiring plaintiff to participate in mediation and/or arbitration pursuant to Sections XXIX.B and XXIX.C of the franchise agreements. The court directs the parties to schedule a mediation pursuant to Section XXIX.B within twenty (20) days and to submit a joint report to the court indicating who the mediator(s) are and when the mediation will take place no later than July 22, 2014. If the matter is not resolved through mediation, the court will require the parties to arbitrate their affirmative claims under Section XXIX.C of the franchise agreements. Plaintiff's motion for preliminary injunction is presently set for hearing on September 29, 2014. The court will treat this motion as a motion for interim relief pending submission of the parties' dispute to arbitration. The court does not believe that it is necessary to issue an order to show cause re preliminary injunction to effectuate these orders and so denies defendants' request for issuance of such an order.